# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

BILLY D. OLIVIER                                         CIVIL ACTION NO.

VERSUS                                                  18-CV-568-SDD-EWD

EXXON MOBIL CORPORATION

## RULING

This matter is before the Court on the Motion for Summary Judgment[1] by Defendant, Exxon Mobil Corporation ("EMC" or "Defendant").  Plaintiff, Billy D. Olivier ("Olivier" or "Plaintiff") filed an Opposition[2] to which EMC filed a Reply,[3] and to which Plaintiff filed a Sur-Reply.[4] Plaintiff also filed a Motion for Partial Summary Judgment Regarding Medical Causation,[5] which EMC has opposed,[6] and to which Plaintiff filed a Reply.[7] On April 18, 2022, the Court entered an Order denying both Motions "for written reasons to be assigned."[8]  These reasons are provided below.

## I.    FACTUAL BACKGROUND[9]

On September 23, 2017, while Plaintiff was performing tasks in connection with plugging and abandonment or decommissioning operations of EMC's offshore platform

---

[1] Rec. Doc. No. 48.
[2] Rec. Doc. No. 57.
[3] Rec. Doc. No. 67.
[4] Rec. Doc. No. 88.
[5] Rec. Doc. No. 50.
[6] Rec. Doc. No. 56
[7] Rec. Doc. No. 68.
[8] Rec. Doc. No. 99.
[9] The Court recently issued a Ruling granting in part and denying in part EMC's Motion for Leave to Correct Exhibit filed with Rec. Doc. 48, Strike Incorrect Statements, and Supplement Motion for Summary Judgment. Rec. Doc. No. 98.  The Court struck the Affidavit of Jamie Siekkinen in its entirety.  To the extent any of EMC's proposed statements of undisputed facts rely solely on this Affidavit, those statements shall be disregarded unless otherwise properly supported.

(the "Lena Platform"), he was injured while walking on top of a rig skid beam located on the Platform.[10]   Plaintiff contends that this injury occurred when his foot "slid" and his heel "popped" into an unmarked and uncovered hole in the walkway.[11]   Plaintiff also contends the rig skid beam was used as a walkway on the Platform, and utilizing this beam was necessary to perform tasks by anyone on the Platform.[12]   Additionally, the rig skid beam was not being used for rig functions at the incident location at any relevant time.[13]

At all relevant times, Plaintiff was employed by Weatherford as an Operator 2, or a roustabout, and had been working as part of the Weatherford crew on the Lena Platform for approximately nine months, fourteen days at a time, in twelve-hour shifts.[14] While working on the Lena Platform, Plaintiff would encounter the rig skid beam every day.[15]   At the time of his alleged injury, Plaintiff was "on the shakers," performing a task that involved using magnets to remove shavings from drilling mud and shakers.[16]

On November 7, 2016, EMC issued a Service Order to Weatherford (the "Work Order") for the plugging & abandonment operations on the Lena Platform.[17] The Work Order provided that plugging & abandonment services would be performed by

---

[10] See Rec. Doc. No. 1, Complaint; Rec. Doc. No. 48-3, Deposition of Billy D. Olivier, pp. 100-10. See also id., ex. 3 (depicting the Rig Skid Beam).

[11] Rec. Doc. No. 57-1, p. 2 (citing Ex. E, Olivier depo., p. 100:20-102:25, 110:07-111:06).

[12] Rec. Doc. No. 57-12, Exxon's "Walkway Improvements" report; Rec. Doc. No. 57-16, Exxon's "MC 280 Back Sprain" report; Rec. Doc. No. 57-13, Goodwin depo., 43:05-43:14; Rec. Doc. No. 57-8, Ortego depo., 32:11-32:23, 131:23-132:24; Rec. Doc. No. 57-3, Brandon Woods depo., 19:06-19:16; Rec. Doc. No. 57-7, Kamps deposition, 50:06-50:22; Rec. Doc. No. 57-21, Siekkinen depo., 24:10-28:25.

[13] Rec. Doc. No. 57-14, Joe Woods depo., 75:06-76:10; Rec. Doc. No. 57-13, Goodwin depo., 39:21-42:13, 59:10-60:05; Rec. Doc. No. 57-8, Ortego depo., 33:24-34:21, 69:11-70:22; Rec. Doc. No. 57-12, Exxon's "Walkway Improvements" report.

[14] Rec. Doc. No. 57-2, Deposition of Billy D. Olivier, p. 38, ll. 7-16 and p. 49, ll. 7-21.

[15] Id. at p. 90, ll. 8-17.

[16] Id. at p. 70, l. 3 – p. 71, l. 9.

[17] Rec. Doc. No. 60-3 at pp. 1-2.

Weatherford on Lena at an estimated cost of $25.5 million.[18]  The Work Order incorporated the terms of a prior agreement, Subagreement A2558864 (the "Subagreement"),[19] which, in turn, incorporated the terms of an existing master services agreement between EMC and Weatherford: Goods and Services Agreement No. 60186/A1380928[20] (the "Master Weatherford Contract").[21]

Language from the Master Weatherford Contract, incorporated into the Work Order, provides that Weatherford was performing the Work Order services as an independent contractor, stating: "In performing Work and other obligations under each Order, Contractor shall be an independent contractor and not the agent or employee of Buyer."[22] The Work Order also contained the following terms:

- "The relationship of employer and employee shall not exist between Buyer and Contractor or any of Contractor's employees . . . Work shall be performed under the supervision and control of Contractor, and Buyer shall have no authority to supervise Contractor's employees, representatives, or subcontractors."[23]

- "Contractor shall be responsible for providing a healthy and safe work place and working environment for its employees and Subcontractors during performance of Work on Buyer's premises. Contractor shall protect the health and safety of Contractor's, Subcontractors' and Buyer's employees, the public, and other third parties from any danger associated with the Work. All tools, equipment, facilities and other items used by the Contractor and its practices employed to perform the Work are considered

---

[18] *Id.* at p. 1.
[19] *Id.* at p. 3.
[20] *Id.* at p. 55 (Master Weatherford Contract).
[21] *Id.* at pp. 1, 3, 55, & 62.  ("While the Master Weatherford Contract initially named Weatherford International, Inc. as a party to the Agreement, rather than Weatherford International, LLC, the Weatherford Contract was later amended to name Weatherford International, LLC—Plaintiff's employer at the time of the alleged injury—as the contracting party."  Rec. Doc. No. 48-2, p. 2 (citing Rec. Doc. No. 60-3 at p. 184).
[22] Rec. Doc. No. 60-3, p. 67, cl. 5.
[23] *Id.*

part of the working environment."[24]

Plaintiff's injury occurred while he was performing abandonment operations on Lena Platform pursuant to the Work Order issued by EMC to Weatherford.[25] Weatherford personnel assigned Plaintiff particular jobs or tasks, including the task he was performing at the time of his injury.[26]  At all relevant times, the Lena Platform was located on and permanently attached to the Outer Continental Shelf at Mississippi Canyon Block 280, approximately 50 miles southeast of Grand Isle, Louisiana.[27]  The United States Secretary of the Interior tasks the federal Bureau of Safety and Environmental Enforcement ("BSEE") with promoting safety in offshore oil and gas operations on the Outer Continental Shelf ("OCS").[28]

The remaining relevant facts in this matter are sharply disputed.

EMC contends that the BSEE conducted regular inspections and monitoring activities on the Lena Platform,[29] and that the Outer Continental Shelf Department of the United States Coast Guard (the "Coast Guard") also has authority to conduct safety inspections of offshore platforms; the Coast Guard inspected the Lena Platform on at least one occasion prior to September 23, 2017.[30]

---

[24] *Id.* at p. 87, cl. 21.1.

[25] *Id.* at pp. 1-2.

[26] Rec. Doc. No. 48-3, Plaintiff depo. at p. 42, l. 8 – p. 44, l. 4.

[27] Rec. Doc. 1, ¶ 3.

[28] *See* Sec. of the Interior Order No. 3299, Amend. No. 2 (Aug. 29, 2011), available at https://www.doi.gov/sites/doi.gov/files/elips/documents/3299a2-establishment_of_the_bureau_of_ocean_energy_management_the_bureau_of_safety_and_environment al_enforcement_and_the_office_of_natural_resources_revenue.pdf (last accessed Oct. 14, 2021) (providing that BSEE is empowered with the "authority to inspect, investigate, summon witnesses and produce evidence, levy penalties, cancel or suspend activities, and oversee safety, response, and removal preparedness").

[29] Rec. Doc. No. 48-7, Deposition of Kendall Farrar, p. 68, l. 18 – p. 69, l. 14.; Rec. Doc. No. 48-8, Excerpts from Deposition of Eddie Ortego, p. 88, l. 24 – p. 89, l. 25.

[30] Rec. Doc. No. 48-9, Deposition of Erik Case and 1442 Deposition of Exxon Mobil Corporation ("Deposition of Exxon Mobil"), p. 189, l. 22 – p. 198, l. 15

The rig skid beam was installed on the Lena Platform when Lena was constructed in the early 1980s; it was a piece of equipment used to connect to—and accurately position—a rig.[31]   Further, the rig skid beam was located on the Lena Platform's top deck, though it was not part of the deck; it ran the entire distance of the Platform, and it was "a main structural component of the platform."[32] The rig skid beam contained rectangular cutouts, referred to as lug slots, used for the attachment of a rig.[33]

EMC claims that, prior to 2017, it has no record of injury occurring in connection with the rig skid beam, and, to date, neither BSEE nor the Coast Guard, the two primary regulatory entities charged with regulating offshore platforms, has ever issued a notice of deficiency or "incident of noncompliance" to EMC in connection with the rig skid beam on the Lena Platform.[34]

Citing to Plaintiff's deposition testimony, EMC acknowledges that it had personnel on the Lena Platform, but EMC maintains that it never provided Plaintiff with instruction as to tasks to be performed.[35] EMC contends that, at all relevant times, Weatherford was responsible for (1) conducting Job Safety Analyses (JSAs) for its employees on the Lena Platform; (2) training Plaintiff; and (3) directing all of Plaintiff's activities on the Lena Platform.[36]  EMC claims it did not authorize Plaintiff to walk on the

---

[31] Rec. Doc. No. 48-5 at p. 25, Plaintiff Deposition, ex. 3 (photograph depicting Rig Skid Beam and lug slots).

[32] Rec. Doc. No. 48-10, Excerpts from Deposition of Jake Kamps, p. 37, ll. 2-25; id. at p. 44, ll. 20-24.

[33] Rec. Doc. No. 48-5 at p. 25, Plaintiff Deposition, ex. 3 (photograph depicting Rig Skid Beam and lug slots).

[34] Rec. Doc. No. 48-9, Deposition of Exxon Mobil, p. 198, ll. 10-15 (testifying that the Coast Guard had never provided EMC "with a notice of deficiency as it relates to the rig skid beams on the Lena platform"); id. at p. 199, ll. 20-24 (testifying that BSEE never provided EMC with any INCs, or incidents of noncompliance pertaining to the rig skid beams on the Lena Platform). *See also id*. at p. 140, ll. 5- 15 (testifying that the term "INC" refers to an incident of noncompliance, which would be issued by BSEE for a violation of a regulation).

[35] Rec. Doc. No. 48-3, Plaintiff Deposition, p. 42, l. 8 – p. 44, l. 4.

[36] Rec. Doc. No. 48-9, Deposition of Exxon Mobil, p. 206, l. 2 – p. 208, l. 1.

rig skid beam.[37]   EMC argues that Plaintiff's reason for walking on top of the rig skid beam on the Lena Platform was not because of EMC; rather, Plaintiff testified that he walked on the beam because it was the "fastest way and easiest way to get to the platform."[38]

In his deposition, Plaintiff testified that he was aware of the lug slots on the beam for approximately nine months prior to his injury, which was entire time he was on the Platform,[39] and he would cross over and walk on the beam "every day."[40]   Plaintiff also testified that he did not, and does not, believe the rig skid beam to have been a hazard.[41]

Plaintiff contends the rig skid beam was used generally as a walkway on the Lena Platform at the time Plaintiff was injured.[42]   Plaintiff claims holes/openings (lug slots) in the walkway were accessible to personnel working on the Lena Platform and large enough for a person's foot to inadvertently pass through.[43]   In fact, Plaintiff claims there was no way to work on the Lena Platform without traversing the walkway.[44] Plaintiff contends EMC knew that walking and working on the walkway was the only way

[37] Rec. Doc. No. 48-3, Plaintiff Deposition, p. 91, ll. 17-19; Rec. Doc. No. 48-8, Excerpts from Deposition of Eddie Ortego, p. 31, l. 15; *id.*, pp. 83-84. *See also* Rec. Doc. No. 48-7, Deposition of Kendall Neal Farrar, p. 58, l. 24 – p. 59, l. 16 (testifying that he'd witnessed individuals stepping onto the Rig Skid Beam to get from one side of the beam to the other, not to traverse atop the distance of the Beam).

[38] Rec. Doc. No. 48-3, Plaintiff Deposition, at p. 81, l. 6-10.

[39] *Id.* at p. 103, ll. 4-10.

[40] *Id.* at p. 90, ll. 8-13.

[41] *Id.* at p. 94, ll. 8-11.

[42] *See* Rec. Doc. No. 57-12, Exxon's "Walkway Improvements" report; Rec. Doc. No. 57-16, Exxon's "MC 280 Back Sprain" report; *See* Rec. Doc. No. 57-13, Goodwin depo., 43:05-43:14; Rec. Doc. No. 57-8, Ortego depo., 32:11-32:23; Rec. Doc. No. 57-3, Brandon Woods depo., 19:06-19:16; Rec. Doc. No. 57-7, Kamps deposition, 50:06-50:22.

[43] Rec. Doc. No. 57-7, Kamps depo., 41:11-41:21; Rec. Doc. No. 57-8, Ortego depo., 33:09-35:09; Rec. Doc. No. 57-13, Goodwin depo., 35:14-35:19; Rec. Doc. No. 57-21, Siekkinen depo., 45:18-46:11, 62:01-63:01

[44] Rec. Doc. No. 57-3, Brandon Woods depo., 19:06-19:16; Rec. Doc. No. 57-8, Ortego depo., 32:11-32:23, 131:23-132:24; Rec. Doc. No. 57-13, Goodwin depo., 43:05-43:14; Rec. Doc. No. 57-21, Siekkinen depo., 24:10-24:25, 25:16-26:12, 27:19-28:25.

the workers could perform their jobs, and it watched workers like Plaintiff walking and working on the walkway on the night of the incident in which Plaintiff was injured.[45] Plaintiff cites to 33 C.F.R. § 142.87, Guarding of deck openings, which states: "[o]penings in decks accessible to personnel must be covered, guarded, or otherwise made inaccessible when not in use" and [t]he manner of blockage shall prevent a person's foot or body from inadvertently passing through the opening.[46] Prior to Plaintiff's injury, the holes/openings in the walkway were not covered, guarded, or made inaccessible in any way when they were not in use.[47]

EMC's Upstream Safety Manual supplied mandatory rules for the Lena Platform,[48] and it supplies the "minimum safety requirements for personnel on [Exxon's] facilities."[49] Further, EMC's mandatory Upstream Safety Manual ("the Manual") required walkways to be covered with anti-slip materials as practical.[50] Prior to the incident at issue, the walkway was not covered with anti-slip materials, despite it being practical, according to Plaintiff.[51] EMC's Manual required walkways to be adequately illuminated.[52] Plaintiff claims that, prior to the incident at issue, the walkway was not adequately illuminated.[53] Further, Plaintiff contends the holes in the walkway were difficult to see at night because they blended in with the rusty/brown color of the

---

[45] Rec. Doc. No. 57-8, Ortego depo., 131:23-132:24.

[46] *See* 33 C.F.R. § 142.87; *see also* Rec. Doc. No. 57-22, Perkin Affidavit, ¶ 58.

[47] Rec. Doc. No. 57-10, Exxon "One Pager" investigation report; Rec. Doc. No. 57-12, Exxon's "Walkway Improvements" report; Rec. Doc. No. 57-16, Exxon's "MC 280 Back Sprain" report.

[48] Rec. Doc. No. 57-7, Kamps depo., 21:25-22:24, 23:21-23:25; Rec. Doc. No. 57-13, Goodwin depo., 60:14-61:06; Rec. Doc. No. 57-14, Joe Woods depo., 66:06-66:19.

[49] Rec. Doc. No. 57-11, Exxon USM excerpts, p. 4.

[50] *Id*. at p. 5.

[51] Rec. Doc. No. 57-14, Joe Woods depo., 75:06-76:10; Rec. Doc. No. 57-13, Goodwin depo., 59:10-60:05; Rec. Doc. No. 57-8, Ortego depo., 69:11-70:22; *see also* Rec. Doc. No. 57-21, Siekkinen depo., 35:08-37:11, 62:01-63:01

[52] Rec. Doc. No. 57-11, Exxon USM excerpts, p. 5.

[53] Rec. Doc. No. 57-14, Joe Woods depo., 30:07-31:21; Rec. Doc. No. 57-21, Siekkinen depo., 47:09-48:19, Rec. Doc. No. 57-10, Exxon "One Pager" investigation report.

walkway at the location of the incident at issue.[54]    EMC's Manual also required walkways to have colored markings to warn of edges or elevation changes.[55] Plaintiff claims, however, that at the time of the incident at issue, the walkway did not bear sufficient colored markings.[56]    EMC's Manual also required walkways to maintain a width of 4 feet;[57] however, prior to the incident at issue, the walkway was not 4 feet wide.[58]    Finally, EMC's Manual required deck and floor openings where a person could accidentally step to be adequately barricaded;[59] however, prior to the incident at issue, the holes/openings in the walkway were not barricaded.[60]

Considering the condition of the walkway, EMC admitted there was no right of way for workers to traverse the walkway.[61]    Plaintiff cites the deposition testimony of Angus Lum, who was in charge of EMC's upstream safety for the entire Gulf, who testified that he would have recommended a change before the incident at issue had he known the reality of the activities on the Platform.[62]    Plaintiff contends multiple witnesses have confirmed that compliance with the law and the Manual prior to the incident at issue was feasible, practical, and affordable.[63]

---

[54] Rec. Doc. No. 57-14, Joe Woods depo., 30:07-31:21; Rec. Doc. No. 57-21, Siekkinen depo., 47:09-48:19, Rec. Doc. No. 57-10, Exxon "One Pager" investigation report.
[55] Rec. Doc. No. 57-11, Exxon USM excerpts, p. 5.
[56] Rec. Doc. No. 57-10, Exxon "One Pager" investigation report ("[o]ld and faded hazard identification markings create more susceptibility to an existing hazard" and "[t]he hazard areas on the beam had identification markings but were faded/worn").
[57] Rec. Doc. No. 57-11, Exxon USM excerpts, p. 5.
[58] Rec. Doc. No. 57-8, Ortego depo., 40:01-43:02 and attached photograph of Exhibit 1 thereto (marked XOM 00001170); Rec. Doc. No. 57-7, Kamps depo., 52:23-53:23.
[59] Rec. Doc. No. 57-11, Exxon USM excerpts, p. 7.
[60] Rec. Doc. No. 57-4, Exxon depo. (Erik Case), 182:08-183:13.
[61] *Id*. at 173:04-173:23
[62] Rec. Doc. No. 57-17, Lam depo., 59:16-60:12.
[63] Rec. Doc. No. 57-14, Joe Woods depo., 75:06-76:10; Rec. Doc. No. 57-13, Goodwin depo., 59:10-60:05; Rec. Doc. No. 57-8, Ortego depo., 69:11-70:22; *see also* Rec. Doc. No. 57-21, Siekkinen depo., 35:08-37:11, 62:01-63:01.

Plaintiff submits evidence of a slipping incident/injury on this same walkway that took place one month prior to Plaintiff's injury involving a worker named Billy Landry ("Landry").[64] Plaintiff contends slipping and tripping incidents on the Platform are known by EMC to carry the potential consequence of severe injury or death.[65]  In a report following the Landry incident, EMC stated that Landry "inadvertently lost his footing on the rig beam in the middle of the drill deck" and slipped on the rig skid beam.[66]  Thus, Plaintiff contends EMC knew Landry was on the walkway when he slipped.[67]  Plaintiff claims that, as owner and operator of the Platform, EMC was required by law and its own policies to investigate Landry's incident, determine the causes, and take appropriate action.[68]  However, EMC did not investigate the Landry incident, did not notify anyone of the incident, and took no corrective actions.[69]

Plaintiff was injured by slipping on the same walkway as Landry, approximately one month later.[70] Plaintiff stepped up onto the walkway and took a few steps to move beyond an adjacent pump. When he raised his right foot to step down and off the walkway, his left foot "slid" on the walkway and his heel "popped" into one of the walkway's many unmarked and uncovered holes, causing him to fall forward.[71]  During the fall, Plaintiff caught himself on the adjacent pump, twisted his back, and suffered

---

[64] Rec. Doc. No. 57-2, Correspondence and report regarding prior incident, pp. 1 and 5 of 6; Rec. Doc. No. 57-3, Brandon Woods depo., 18:20-19:16.
[65] Rec. Doc. No. 57-4, Exxon depo. (Erik Case), 55:03-55:23; Rec. Doc. No. 57-3., Brandon Woods depo., 48:18-48:25; *see also* Rec. Doc. No. 57-11, Exxon USM excerpts, p. 6.
[66] Rec. Doc. No. 57-2, Correspondence and report regarding prior incident, p. 1; Rec. Doc. No. 57-3, Brandon Woods depo., 18:20-19:16.
[67] Rec. Doc. No. 57-3, Brandon Woods depo., 18:20-19:16.
[68] Rec. Doc. No. 57-4., Exxon depo. (Erik Case), 75:15-75:23, 78:15-86:17, 95:05-95:13, 148:09-148:14.
[69] Rec. Doc. No. 57-9, Correspondence and report regarding Olivier incident, pp. 2-3 (incident report).
[70] *Id.*
[71] Rec. Doc. No. 57-6, Olivier depo., p. 100:20-102:25, 110:07-111:06.

severe injuries.[72]  Plaintiff claims he "was watching where [he] was going" and his left foot was "solid" when he put it down;[73] he also claims stepping onto, walking on, and stepping off the walkway were authorized by EMC.[74]

Following Plaintiff's incident, EMC completed an incident report.[75]  This time, Plaintiff states that EMC complied with its investigative responsibilities as to Plaintiff's incident as required by the law and EMC's internal mandates.[76] In this report, EMC admitted that the walkway was an "existing hazard," a "tripping hazard," and had prior "hazard identification markings" that were "old and faded" and "faded/worn."[77]  EMC admitted it applied "new identification marking" and planned to cover the holes (as required of EMC by law and EMC's Manual).[78] EMC admitted it failed to ensure the walkway was identified as a "tripping hazard" in the JSAs pertaining to the work.[79] EMC's corporate representative admitted that an engineered solution was necessary to address the hazardous walkway and, without one, there was no way for workers to traverse the walkway (as was required on Lena) safely.[80]  After Plaintiff's incident, EMC covered the walkway with wood and a non-skid surface, and the covering blocked

---

[72] *Id.* at 101:06-102:25, 110:07-111:06; *see also* Rec. Doc. 50 and the supporting pleadings and evidence filed therewith.

[73] Rec. Doc. No. 57-6, Olivier depo., 100:20-101:03, 110:07-110:16.

[74] Rec. Doc. No. 57-8, Ortego depo., 32:11-32:23; Rec. Doc. No. 57-21, Siekkinen depo., 24:10-28:25.

[75] Rec. Doc. No. 57-9, Correspondence and report regarding Olivier incident, pp. 2-3 (incident report).

[76] Rec. Doc. No. 57-10, Exxon "One Pager" investigation report; Rec. Doc. No. 57-16, Exxon's "MC 280 Back Sprain" report; Rec. Doc. No. 57-4, Exxon depo. (Erik Case), 37:12-38:07, 52:25-53:15; Rec. Doc. No. 57-12, Exxon's "Walkway Improvements" report; Rec. Doc. No. 57-9, Correspondence and report regarding Olivier incident, pp. 6-9 (Kamps email), 10-11 (Munksgaard email); Rec. Doc. No. 57-5, Exxon's RCA Program excerpts, pp. 5-6, 11, 13.

[77] Rec. Doc. No. 57-10, Exxon "One Pager" investigation report.

[78] *Id.*; *see also*, e.g., 33 C.F.R. § 142.87 (requires Exxon to ensure any openings large enough for a person's foot to inadvertently pass through are guarded); Rec. Doc. No. 57-11, Exxon USM excerpts, pp. 5, 7.

[79] Rec. Doc. No. 57-10, Exxon "One Pager" investigation report; Rec. Doc. No. 57-21, Siekkinen depo., 34:06-34:21; *see also* 30 C.F.R. § 250.1911(b) (requires Exxon to ensure the JSA identifies "the existing or potential safety, health, and environmental hazards").

[80] Rec. Doc. No. 57-4, Exxon depo. (Erik Case), 173:04-173:23.

access to the holes in the walkway.[81]

In the aftermath of the incident, EMC admitted that the placement of the wood and nonskid eliminated the "lug hole risk" and "addressed this tripping hazard."[82] One EMC employee later testified that the walkway and its holes were tripping hazards.[83] Other testifying EMC employees, including its corporate representative, took the position that the holes in the walkway were not a hazard and did not present a risk.[84] In its corporate deposition, EMC also took the position that the wood and nonskid were not placed onto the walkway to eliminate or remediate any hazard or risk.[85],[86]

Plaintiff cites to its engineering experts' Affidavit in stating the steps EMC should have undertaken pursuant to the Hierarchy of Controls.[87]  Plaintiff also claims that EMC hid information from federal entities.  EMC had a four-man upper management team responsible for reporting Plaintiff's incident and injuries to BSEE.[88] Each member of the four-man upper management team received reports on September 23, 2017 specifically identifying the involvement of the walkway and one of its opening/holes in Plaintiff's incident and injuries. Four days later, on September 27, 2017, the leader of the four-man team reported to BSEE only that Plaintiff had "stumbled and caught himself in the work area."[89] BSEE requested additional information from EMC, and on October 4,

---

[81] Rec. Doc. No. 57-12, Exxon's "Walkway Improvements" report; Rec. Doc. No. 57-7, Kamps depo., 82:24-83:18.

[82] Rec. Doc. No. 57-9, Correspondence and report regarding Olivier incident, pp. 6-9 (Kamps email), 10-11 (Munksgaard email); Rec. Doc. No. 57-10, Exxon "One Pager" investigation report.

[83] Rec. Doc. No. 57-3, Brandon Woods depo., 40:11-40:21.

[84] Rec. Doc. No. 57-4, Exxon depo. (Erik Case), 100:01-100:15; *see also, e.g.*, Rec. Doc. No. 57-20, Farrar depo., 100:07-100:12.

[85] Rec. Doc. No. 57-4, Exxon depo. (Erik Case), 102:13-102:25.

[86] Plaintiff claims EMC destroyed the Lena Platform without notice while this case was administratively closed, so he was unable to inspect the walkway, but this offered statement of fact is unsupported by record evidence. Rec. Doc. No. 57-1, p. 18.

[87] *See* Rec. Doc. No. 57-1, pp. 18-20 (citing Rec. Doc. No. 57-22, Perkin Affidavit).

[88] Rec. Doc. No. 57-4, Exxon depo. (Erik Case), 134:11-134:23.

[89] Rec. Doc. No. 57-18, Exxon's reports to BSEE, p. 2 of 6 (September 27, 2017 report).

2017, EMC reported to BSSE only that Plaintiff "lost his balance and stumbled."[90] EMC never notified BSEE or the USCG that the rig skid beam was being used as a walkway on the Platform or of the involvement of an opening/hole in the deck in the incident and injuries at issue.[91] In 2015, prior to Plaintiff's incident/injuries, EMC was issued an INC by the government for "an opening large enough for personnel to pass a foot through."[92]

Plaintiff filed this lawsuit against EMC under Louisiana law, "including but not limited to provisions of the Louisiana Civil Code (e.g., articles 2315, 2316, 2317, 2317.1, and 2322) [and] pursuant to the Outer Continental Shelf Lands Act and/or under any other law found to be applicable to this cause of action."[93]   EMC has moved for summary judgment, arguing that (1) it is not liable under the independent contractor defense; (2) Plaintiff cannot show an independent liability for negligence by EMC because EMC had no duty to Plaintiff; and (3) Plaintiff has no evidence to establish that his injury resulted from a vice or defective condition that presented an unreasonable risk of harm to others, since the condition at issue was open and obvious to all who encountered it.[94]   Plaintiff opposes this motion.   The Court has reviewed the record evidence in this case and has considered the arguments of the Parties and the applicable law; the Court finds that this matter is rife with genuine, material fact disputes such that summary judgment is improper.

---

[90] *Id.* at p. 5 of 6 (October 4, 2017 report).
[91] Rec. Doc. No. 57-4, Exxon depo. (Erik Case), 219:23-220:11, 221:15-222:02
[92] *Id.* at 142:10-146:07; *see also* Rec. Doc. No. 57-19, INC issued to Exxon, p. 2 (XOM 00002766).
[93] Rec. Doc. No. 1, ¶ 10.
[94] Rec. Doc. No. 48-1, pp. 7-8.

## II.    LAW AND ANLYSIS

### A.  Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[95]  "When assessing whether a dispute to any material fact exists, we consider all of the evidence in the record but refrain from making credibility determinations or weighing the evidence."[96]  A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case."[97]  If the moving party satisfies its burden, "the non-moving party must show that summary judgment is inappropriate by setting 'forth specific facts showing the existence of a genuine issue concerning every essential component of its case.'"[98]  However, the non-moving party's burden "is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence."[99]

Notably, "[a] genuine issue of material fact exists, 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[100]  All reasonable factual inferences are drawn in favor of the nonmoving party.[101]  However, "[t]he Court has no duty to search the record for material fact issues. Rather, the party opposing the

---

[95] Fed. R. Civ. P. 56(a).
[96] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co*., 530 F.3d 395, 398-99 (5th Cir. 2008).
[97] *Guerin v. Pointe Coupee Parish Nursing Home*, 246 F.Supp.2d 488, 494 (M.D. La. 2003)(quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)(en banc)(quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25, 106 S.Ct. at 2552)).
[98] *Rivera v. Houston Independent School Dist.,* 349 F.3d 244, 247 (5th Cir. 2003)(quoting *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998)).
[99] *Willis v. Roche Biomedical Laboratories, Inc.,* 61 F.3d 313, 315 (5th Cir. 1995)(quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).
[100] *Pylant v. Hartford Life and Accident Insurance Company*, 497 F.3d 536, 538 (5th Cir. 2007)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).
[101] *Galindo v. Precision American Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985).

summary judgment is required to identify specific evidence in the record and to articulate precisely how this evidence supports his claim."[102]  "Conclusory allegations unsupported by specific facts … will not prevent the award of summary judgment; 'the plaintiff [can]not rest on his allegations … to get to a jury without any "significant probative evidence tending to support the complaint."'"[103]

### B.    EMC's Motion for Summary Judgment

#### 1.    Independent Contractor Defense

Under Louisiana law, a principal is generally not liable for the conduct of an independent contractor.[104] There are exceptions where "(1) the liability arises from ultrahazardous activities performed by the contractor on behalf of the principal or (2) the principal retains operational control over the contractor's acts or expressly or impliedly authorizes those acts."[105]

EMC argues that, pursuant to the Weatherford Contract provisions discussed above, "(1) under the independent contractor defense, EMC cannot be held liable for Weatherford's negligence (Plaintiff does not dispute this); (2) the contract between EMC and Weatherford (the "Work Order") limited EMC's duty with respect to Plaintiff, such that Weatherford assumed the duty to ensure the safety of Plaintiff (Plaintiff does not dispute this either); [and] (3) because that duty was limited by the Work Order, EMC had no duty to Plaintiff[.]"[106]

---

[102] *RSR Corp. v. International Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010).
[103] *Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 713 (5th Cir. 1994)(quoting *Anderson*, 477 U.S. at 249).
[104] *Coulter v. Texaco, Inc.*, 117 F.3d 909, 911–12 (5th Cir.1997).
[105] *Id*. at 912.
[106] Rec. Doc. No. 67, p. 3.

Plaintiff contends that the independent contractor defense applies only to vicarious liability claims and not direct liability claims, as Plaintiff has asserted here against EMC. Plaintiff relies on the decision by the Eastern District of Louisiana in *Stokes v. Freeport-McMoran, Inc.*, another case involving an independent contractor falling on a platform and sustaining injuries, wherein the court held that:

> Louisiana law provides that "a premise owner is not *vicariously* liable for the negligence of an independent contractor unless the owner retained control over the contractor's work or expressly or impliedly approved its unsafe work practice that led to an injury." *Thomas v. A.P. Green Industries, Inc.*, 2005-1064, p. 8 (La. App. 4 Cir. 5/31/06); 933 So. 2d 843, 852 (emphasis added). However, the independent contractor defense bars only a vicarious liability claim, not a direct liability claim arising out of a premise owner's negligence. *Id.* If Louisiana law applies, Plaintiff's direct liability claim against [the defendant] is not barred by the independent contractor defense.[107]

EMC argues Plaintiff's belief that the defense only applies to vicarious liability claims is misplaced and foreclosed by Fifth Circuit jurisprudence. EMC relies on *Graham v. Amoco Oil Co.*, wherein the Fifth Circuit held that the question of whether a principal owed an independent duty to an independent contractor's employee is resolved by looking to the terms of the contract between the principal and the independent contractor: Louisiana courts "define[] the principal's duty by reference to its contract with the independent contractor," and "Amoco's duties were expressly delineated in its contract with Dual."[108] EMC also quoted the Eastern District of Louisiana in *Hosey v. Shell Oil Co.*, wherein the court found that, "[w]hen an employee of an independent contractor alleges that the relationship between a platform owner and its employer creates an independent duty of care on the part of the platform owner, the

---

[107] No. 14-1538, 2015 WL 8276240, at *2 (E.D. La. Dec. 7, 2015)
[108] 21 F.3d 643, 647-48 (5th Cir. 1994).

Court first looks to the terms of the contract between the owner and the independent contractor."[109]

The district court for the Eastern District of Louisiana addressed a case similar to the present case in *Hollinger v. Pogo Producing Co.*[110] Hollinger worked as an operator/mechanic on an oil production platform owned by Pogo Producing Company and ATP Oil & Gas Corporation; he was employed by Wood Group Production Services, an independent contractor that provides operational services and experienced employees for oil companies. Pogo contracted with Wood Group for these services under a Master Service and Supply Agreement. Hollinger worked on the "Main Pass Block 123" platform, which is in federal waters on the Outer Continental Shelf in the Gulf of Mexico.[111]

Hollinger filed suit seeking damages for injuries allegedly sustained while working on the platform. While carrying repair parts, Hollinger slipped on a mat, fell on his back, and struck his head on the metal floor grating. It was unclear whether Hollinger slipped on oil on the mat or whether he slipped on the mat because it was not a "non-skid" mat. In any event, Hollinger was eventually taken by helicopter to receive medical treatment, and then he went home.[112]  Hollinger alleged that, because Pogo's production superintendent, Philip Drolla, periodically inspected the platform, Pogo is liable for the failure to maintain the platform safely under the Agreement. Hollinger also argued that, because Pogo and ATP own the platform, they are directly liable for their failure to provide a suitable mat for the conditions on the platform, and that Phillip Drolla's

---

[109]  494 F. Supp. 3d 381, 390-91 (E.D. La. 2020).
[110] No. 05-1851, 2006 WL 3068830 (E.D. La. Oct. 25, 2006).
[111] *Id.* at *1.
[112] *Id.*

presence on the platform as Pogo's representative is sufficient constructive knowledge

of a defective condition to impose liablity upon Pogo and ATP under Louisiana's

premise liability law.[113]

In evaluating whether Hollinger could survive summary judgment as to the

Louisiana premises liability law, the court analyzed the claim as follows:

> Louisiana Civil Code article 2322 instructs that building owners are liable for damages incurred through the building's ruin or from defects in the building's original construction. In *Dupre v. Chevron U.S.A., Inc*., 20 F.3d 154, 157-58 (5th Cir.1994), the Fifth Circuit initially held that the owner of a platform owed a duty to employees of independent contractors to exercise reasonable care in "ensur[ing] a safe working environment." However, on denial of rehearing and rehearing *en banc*, the Fifth Circuit clarified its ruling, stating that the court was not willing to hold that the owner of a platform did not owe a duty to independent contractors, separate from vicarious liability, without a full inquiry by a trier of fact. *Dupre v. Chevron*, 33 F.3d 7, 7-8 (5th Cir.1994).

> Other sections of this Court have denied summary judgment in cases with similar facts as the instant case. In *Verdin v. Shell Offshore, Inc.*, 1996 WL 67660 (E.D.La. Feb. 15, 1996)(Berrigan, J.) and *Smith v. Chevron U.S.A., Inc.*, 1999 WL 615174 (E.D.La. Aug. 12, 1999)(Berrigan, J.), the Court found a material issue of fact existed as to whether the owner of the platform breached a duty to provide a safe workplace. But in both of those cases, the plaintiffs alleged breaches of a duty to maintain a safe working environment under *Dupre v. Chevron*, which qualifies the duty as one to adhere to federal regulations regarding oil-producing platforms and to maintain the platform free from recognized hazards, such as the absence of guardrails. Neither plaintiff in those cases alleged a breach of duty under Louisiana premises liability law, although arguably both Louisiana premises law and federal regulation of platforms concern the original construction or the ruin of the permanent structure of the platform.

> But in *Fruge ex rel. Fruge v. Parker Drilling Co*., 337 F.3d 558 (5th Cir.2003), the plaintiff did claim the platform owner's breach of duty under state premises liability law, Louisiana Civil Code article 2322. In *Fruge*, the plaintiff was injured by a hose that ruptured on the platform. The Fifth Circuit held that an action based on state premises liability law was not appropriate when the cause of the injury **was not permanently attached to the building.** *Fruge*, 337 F.3d at 565 (citing *Coulter v. Texas*, 117 F.3d 909, 914 (5th Cir.1997) and La. Civ.Code art. 466).

---

[113] *Id.*

Here, the plaintiff is uncertain whether his injury was caused by a non-skid mat or oil on the floor; however, neither condition would qualify as part of the construction of the platform. Therefore, under *Fruge*, Hollinger cannot maintain a claim for state law premises liability under Article 2322.[114]

Another section of this Court addressed similar claims in *Stevens v. Newfield Exploration Company, et al.*[115] *Stevens* involved a suit brought by an independent contractor employed by Performance who was working to reassemble the West Delta Platform after it suffered heavy damage from Hurricane Katrina.[116]  The plaintiff claimed he was injured when he became pinned between two pipes.[117]  Newfield Exploration owned the platform at the time of the accident; an Mariner leased an area on the platform comprised of 502 square feet on the platform's lower deck.[118]  Newfield and Mariner agreed that Newfield would assume the responsibility of operating, maintaining, and conducting certain repairs on the subsea Mississippi Canyon 357 #1 well, as well as the equipment in the Mariner Leased Area.[119]

The plaintiff sued Mariner under theories of negligence, custodial liability, and premises liability.  Mariner moved for summary judgment on all claims.  Particularly, as to premises liability, Mariner argued it could not be liable under this theory because:

> The pipe was not welded to the platform, Stevens alleges the pipe was not welded to the platform, and Stevens' superintendent testified the east end of the four inch pipe was disconnected prior to the accident. It was incumbent upon Stevens to inspect his own working area, and, had he done so, he would have seen that the pipe was not bolted to the surface of the Platform, and the temporary condition of the site would have been obvious. Stevens was a repairman, so the repairman doctrine forecloses this claim. Stevens was in the best position to determine the risk of harm

---

[114] *Id.* at *3-4 (emphasis added).
[115] No. 07-176-JJB, 2013 WL 12226883 (M.D. La. Apr. 12, 2013).
[116] *Id.*
[117] *Id.*
[118] *Id.*
[119] *Id.*

posed by the pipe on which he chose to stand, and his failure to inspect it was the cause-in-fact of his alleged fall. There was no defect or ruin as contemplated by Louisiana Civil Code article 2322.[120]

The Court explained the appliable legal standards for a premises liability claim:

> For premises liability to attach, the thing that caused the injury must be permanently attached to the building or other construction. *Fruge ex rel. Fruge v. Parker Drilling Co.*, 337 F.3d 558, 565 (5th Cir. 2003). "Things are considered permanently attached if they cannot be removed without substantial damage to themselves or to the immovable to which they are attached." *Id.* "A defect under Article 2322 cannot be inferred simply because an accident occurred." *McCoy v. Liberty Mut. Life Ins. Co.*, 42, 118, p 5 (La. App. 2 Cir. 5/9/07); 956 So. 2d 802, 806. "The question of a defect turns on whether the thing presents an unreasonable risk of harm." *Id.* "Where a risk of harm is obvious, universally known and easily avoidable, the risk is not unreasonable." *Id.* In cases "involving construction site accidents or work on buildings, [Louisiana] courts have found no unreasonable risk of harm where the temporary condition of the work in progress made the risk obvious." *Id.* Even if the condition of the thing requires the exercise of precaution, the risk may be obvious. *Id.* A "plaintiff's status as a repairman is a significant factor in determination of whether a risk is unreasonable." *Celestine v. Union Oil Co. of Cal.*, 94-1868, p. 11 (La. 4/10/95); 652 So. 2d 1299, 1305. Status as a repairman supports absence of unreasonable risk. *Id.*[121]

The Court granted summary judgment in favor of Mariner, finding:

> Stevens was a repairman repairing hurricane damage on the platform. Furthermore, the risk caused by the disconnected pipe was temporary. The fact that the pipe being disconnected caused it to be out of service indicates it would usually be connected so as to be in service. It is obvious that standing on a pipe that is disconnected at one end carries some risk. This risk was avoidable had Stevens exercised precaution, but Stevens failed to inspect the pipe prior to standing on it. Considering all of these circumstances, the risk of harm was obvious and was not unreasonable, so there was no defect. Summary judgment is therefore granted as to this claim.[122]

More recently, in *Lopez v. McDermott*,[123] the original plaintiff ("Lopez") was exposed to asbestos-containing products while employed as a welder/pipefitter at Kellog Brown & Root.  Shortly after filing his lawsuit, Lopez died from mesothelioma; his

---

[120] *Id.* at *3.
[121] *Id.* at *4.
[122] *Id.*
[123] No. 17-8977 cons. w/19-9928, 2020 WL 3668059 (E.D. La. July 6, 2020).

wife and son were substituted as plaintiffs in the case.[124] The plaintiffs amended their Complaint several times, ultimately filing suit against several defendants, including Exxon Mobil, the owner of the fixed offshore platforms upon which Lopez worked.[125] Plaintiffs asserted negligence and strict liability claims against Exxon Mobil under Louisiana law.  In addressing the direct liability claims brought against Exxon Mobil, the court explained:

> "Although the independent contractor defense is a bar to a vicarious liability claim, it is not a bar to direct liability claim arising out of a premises-owner's own negligence." *Thomas*, 933 So. 2d at 852. Plaintiffs argue Exxon had a duty to protect Mr. Lopez from its own acts of negligence under a theory of direct, rather than vicarious, liability. Exxon argues that as a premises owner, it does not owe a duty to protect employees of an independent contractor from the hazards inherent in the job. R. Doc. 449-2 at 19.

> In general, a premises owner has a duty to protect persons on the premises from the unreasonable risk of harm. *Mundy v. Dep't of Health & Human Res.*, 620 So. 2d 811, 813 (La. 1993). Although this duty extends "to the employees of independent contractors for whose benefit the owner must take reasonable steps to ensure a safe working environment," *Thomas*, 933 So. 2d at 852, it does not "require the owner or operator to intervene in and correct the work practices selected by an independent contractor." *Thomas*, 2000 WL 1528082, at *2. Rather, the existence of a duty of a principal to the employees of an independent contractor depends on "**whether the hazard was created by the principal or the independent contractor.**" *Id.* (finding that the independent contractor created the hazardous conditions where the injurious work was directed by the independent contractor's foreman and granting summary judgment accordingly). Further, in a principal-independent contractor relationship, the principal does not owe a duty to protect the contractor's employees from **risks inherent to the job**. *Perkins v. Gregory Mfg. Co.*, 95-01396 (La. App. 3 Cir. 3/20/96), 671 So. 2d 1036, 1040, *writ denied*, 96-0971 (La. 5/31/96), 673 So. 2d 1039 (finding that the risk of being injured by a falling tree is a risk inherent to the role of a tree trimmer engaged in logging operations).  Essentially, while a premises owner may be directly liable for

---

[124] *Id.* at *1.

[125] *Id.*

hazards inherent in the premises, the owner cannot be liable for hazards inherent in a contractor's job.[126]

In *Lopez*, the court concluded that Exxon could not "be held directly liable as a premises owner because the hazard of asbestos exposure is not inherent to Exxon's premises but to the nature of work performed by the welders and pipefitters employed by Brown and Root."[127]   The court then turned to the strict liability claims asserted against Exxon.

> Under the version of article 2317 in effect at the time of Mr. Lopez's alleged exposure, a plaintiff can succeed on a strict liability claim by proving that 1) the injury-causing thing was in the care, custody, and control of the defendant; 2) the thing had a vice or defect that created an unreasonable risk of harm; and 3) the plaintiff's injuries were caused by the vice or defect. *Palermo*, 933 So. 2d at 179. "[E]very non-trivial exposure to asbestos contributes to and constitutes a cause of mesothelioma." *Landry v. Avondale Industries, Inc.*, 2012-0950, p. 6 (La. App. 4 Cir. 3/6/13), 111 So.3d 508, 511. "A defect for the purposes of article 2317 is a flaw or condition of relative permanence inherent in the thing as one of its qualities." *Crane v. Exxon Corp., U.S.A.*, 613 So. 2d 214, 219 (La. Ct. App. 1992). Unlike with a negligence claim, in a strict liability case under this version of article 2317, the plaintiff is relieved of having to prove that the owner knew or should have known of the risk. *Watts*, 135 So. 3d at 60. "Under strict liability concepts, the mere fact of the owner's relationship with and responsibility for the damage-causing thing gives rise to an absolute duty to discover the risks presented by the thing in custody." *Id.*[128]

The court granted summary judgment in Exxon's favor on this claim, finding that:

> The record suggests that Exxon did not have care, custody, or control over the asbestos at the time it allegedly injured Mr. Lopez. "'Custody,' for purposes of strict liability, does not depend upon ownership, but involves the right of supervision, direction, and control as well as the right to benefit from the thing controlled." *Haydel v. Hercules Transp., Inc.*, 94-0016 (La. App. 1 Cir. 4/7/95), 654 So. 2d 408, 414, *writ denied*, 95-1171 (La. 6/23/95), 656 So. 2d 1018 … Although asbestos may have been present in materials, equipment, and tools located on Exxon platforms, and that

---

[126] *Id.* at *6-7 (emphasis added).
[127] *Id.* at *7 (citing *Roach*, 2016 WL 1453074, at *4 (holding that the hazards associated with airborne silica was "inherent in the performance of" sandblasting because the airborne silica was "temporary in nature and transported to the facility by plaintiff's employer and/or a supplier")).
[128] *Id.*

asbestos may have been disturbed, the record does not reflect that Exxon ever had care, custody, or control over that material. Rather, it was Brown & Root supervisors who provided the tools, equipment, and materials, oversaw the operation, and gave instructions to welders and pipefitters. Because the Court finds that Exxon was did not have care, custody, or control over the injurious product, the Court declines to address whether the defect was a temporary condition on the premises that would defeat a strict liability claim.[129]

Turning to the facts of the present case, although the Court recognizes that the Weatherford Contract delineates the rights and responsibilities between Weatherford and EMC as to independent contractor status, the Court finds that the independent contractor defense does not apply in this case under the jurisprudence set forth above. As has been repeated in this Ruling, "the independent contractor defense bars only a vicarious liability claim, not a direct liability claim arising out of a premise owner's negligence."[130]  In *Hollinger*, the court explained that the Fifth Circuit "was not willing to hold that the owner of a platform did not owe a duty to independent contractors, separate from vicarious liability, without a full inquiry by a trier of fact."[131]  *Hollinger* also discussed *Fruge*, wherein the Fifth Circuit held that an action based on state premises law was not appropriate when the cause of the injury was not permanently attached to the building.[132]  The *Hollinger* plaintiff could not survive summary judgment because the alleged injury-causing hazard was oil on the floor or the lack of a non-skid mat – neither of which would be permanently attached to the platform.   In *Stevens*, the pipes alleged to have caused that plaintiff's injuries were not welded to the platform and were noticeably disconnected from the platform prior to the incident. The pipes were a "temporary condition" that would have been obvious.   And in *Lopez*, direct liability

---

[129] *Id.*
[130] *Stokes*, 2015 WL 8276240 at *2 (citing *Thomas*, 933 So. 2d at 852).
[131] *Hollinger*, 2006 WL 3068830 at *3-4 (citing *Dupre v. Chevron*, 33 F.3d at 7-8).
[132] *Id.* (citing *Fruge*, 337 F.3d at 565).

claims against the principal did not survive for the same reason: the asbestos which caused Lopez's injuries was a hazard created by the independent contractor, not the principal, and in the hazard of asbestos exposure is not inherent to Exxon's premises but to the nature of work performed by the welders and pipefitters employed in those industries.[133]

Here, EMC admits that the rig skid beam was installed on the Lena Platform in the early 1980's. Although it was not part of the deck it was attached to, it ran the entire distance of the Platform and was "a main structural component of the platform," according to Jake Kamps, as senior operations engineer employed by EMC.[134] Nothing in the record suggests that the skid rig beam was a temporary attachment or that it had been removed since its installation in the 1980s, at least 40 years ago. Further, the record evidence suggests that the rig skid beam was in the care, custody, and control of EMC at all times. Based on the jurisprudence discussed above, Plaintiff can appropriately assert direct liability claims against EMC for premises/custodial liability under Louisiana law.[135]

## 2. Custodial Liability and Premises Liability

Having found Plaintiff's Louisiana custodial/premises liability claims to be viable, the following standards apply to these claims. Article 2317.1 states, in pertinent part:

> The owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented

---

[133] *Lopez*, 2020 WL 3668059 at *7.
[134] Rec. Doc. No. 48-10, Excerpts from Deposition of Jake Kamps, p. 37, ll. 2-25; id. at p. 44, ll. 20-24.
[135] The Court notes that, if Plaintiff's direct liability claims against EMC were not viable, there are still questions of fact as to the applications of the two exceptions to the independent contractor defense – whether EMC created the hazardous condition and/or whether EMC had operational control.

by the exercise of reasonable care, and that he failed to exercise such reasonable care.

To prevail on a custodial liability claim, a plaintiff must demonstrate: "(1) the object was in the defendant's custody; (2) the thing contained a vice or defect which presented an unreasonable risk of harm to others; (3) the defective condition caused the damage; and (4) the defendant knew or should have known of the defect."[136] "For a defect to create an unreasonable risk of harm, 'the defect must be of such a nature as to constitute a dangerous condition which would reasonably be expected to cause injury to a prudent person using ordinary care under the circumstances.'"[137] Applying Louisiana law, courts have generally held that the simple fact that an accident occurred as a result of an alleged defect does not alone "elevate the condition of the thing to that of an unreasonably dangerous condition."[138] Courts are to consider not only the past accident history of the defect in question, but also "the degree to which a danger may be observed by a potential victim."[139] "If the 'risk of harm is obvious, universally known and easily avoidable, the risk is not unreasonable.'"[140] Moreover, "the unreasonable risk of harm criterion cannot be applied mechanically."[141] Instead, the court "must balance the claims and interests, weigh the risks and the gravity of harm, and consider the individual and societal rights and obligations. The court must balance the probability

---

[136] *Cormier v. Dolgencorp, Inc*., 136 Fed. Appx. 627, 627–28 (5th Cir. 2005)(citing La. C.C. arts. 2317 and 2317.1).

[137] *Price v. Roadhouse Grill, Inc.*, 512 F.Supp.2d 511, 516 (W.D. La. 2007)(quoting *Durmon v. Billings*, 38,514 (La.App. 2 Cir. 5/12/04), 873 So.2d 872, 876).

[138] *Durmon*, 873 So.2d at 877.

[139] *Id.*

[140] *Price*, 512 F.Supp.2d at 516 (quoting *Durmon*, 873 So.2d at 877); *see also Manchack*, 621 So.2d at 654 (stating that "evidence of the absence of other accidents at the same place is relevant and admissible as tending to show that the place was not dangerous and that the defendant did not have actual or constructive knowledge of a dangerous condition.")).

[141] *Id.* (citing *Limberg v. Winn Dixie Louisiana, Inc*., 622 So.2d 1178, 1179 (La.App. 4 Cir. 1993)).

and magnitude of the risk against the utility of the thing."[142]

As to premises liability, Article 2322 provides, in pertinent part:

The owner of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it, or when it is the result of a vice or defect in its original construction. However, he is answerable for damages only upon a showing that he knew or, in the exercise of reasonable care, should have known of the vice or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care.

In evaluating the present case, the Court finds guidance from the decision in *Domingue v. Chevron USA Inc.*, a case decided by the Louisiana Western District Court.[143] In *Domingue*, the plaintiff, an experienced offshore service technician, was working on a permanent offshore production platform as a valve service technician employed by Wood Group.[144] The plaintiff was assigned to work on two fixed platforms owned and operated by Chevron, doing valve and wellhead service and maintenance.[145] One of the platforms had three levels – the top deck, well deck, and cellar deck. The work required the plaintiff and his co-worker to move between the cellar deck and the well deck.[146] This was accomplished by using a fixed vertical ladder; indeed, it was the *only* way to travel between these two decks.[147] Access to this ladder was controlled by a guard rail and a hinged, vertically-opening lift bar, and the lift bar could not be left up in an open position; rather, "a stop mechanism and the force of gravity ensured that the lift bar would fall down to the closed position when it is not being used."[148] Following the plaintiff's accident, this lift bar was replaced by a swing

---

[142] *Limberg*, 622 So.2d at 1179.
[143] No. 6:10-cv-00921, 2012 WL 3744669 (W.D. La. Aug. 24, 2012).
[144] *Id.* at *1.
[145] *Id.*
[146] *Id.*
[147] *Id.*
[148] *Id.*

gate opening horizontally rather than vertically.[149]

On the date of the plaintiff's accident, Chevron stopped work on the platform because of an approaching storm. Once the storm passed, the plaintiff and his co-worker were cleared to resume their work. Whilst using the ladder to move between the well deck to the cellar deck, the plaintiff "lifted the lift bar with his left hand, grabbed the ladder with his right hand, then stepped onto the ladder with his right foot, while his left foot remained on the well deck. As [he] attempted to step onto the ladder with his left foot, his right foot slipped off the ladder, and he began to fall."[150] The plaintiff "held onto the lift bar as he fell and, as the bar dropped down, the biceps muscle in his left arm tore, necessitating surgical repair."[151]

The plaintiff sued Chevron, arguing that it failed to provide him with a safe working environment. Plaintiff sought recovery under Louisiana Civil Code Article 2317 or under Louisiana Civil Code Article 2322.[152] The court noted that "[t]he Fifth Circuit has held that an offshore platform is a building for purposes of Article 2322, and that liability may be imposed under Article 2322 against a building's owner when a defect or ruinous condition is located in an appurtenance to the building."[153]

Chevron moved for summary judgment, arguing that the condition of the ladder and lift bar was open and obvious, as the plaintiff and others had used the ladder on several occasions before without being injured, and a premises owner has no duty to warn of an open and obvious condition.[154] The plaintiff countered, arguing that: the

---

[149] *Id.*
[150] *Id.*
[151] *Id.*
[152] *Id.* at *2.
[153] *Id.* (citing *Coulter v. Texaco, Inc.*, 117 F.3d 909, 914 (5th Cir.1997)).
[154] *Id.*

design, construction, and/or condition of the lift bar and ladder made them unreasonably dangerous; while Chevron failed to replace or repair the lift bar and ladder or provide warnings to users, it replaced the lift bar with a swing gate after the plaintiff's accident; that the risk of danger was not open and obvious to the plaintiff; and that, even if the plaintiff had been aware of the danger, his recovery would require an apportionment of comparative fault.[155]

In beginning its analysis, the court noted:

> The Louisiana Supreme Court has held that whether a thing contains a condition creating an unreasonable risk of harm is a mixed question of fact and law.[156] The Louisiana Supreme Court has also held that legal causation is a mixed question of fact and law.[157] Therefore, finding the existence of factual disputes with regard to either the existence of an allegedly unreasonable condition or the cause of an accident would preclude summary judgment in Chevron's favor.[158]

The court then discussed the evidence demonstrating questions of fact, starting with Chevron's internal investigation report which was prepared by Chevron's health, environment, and safety specialist.  This report identified faults in the design of the ladder and lift bar system, criticized the functionality of the ladder as it "could give rise to an awkward position for the user, and that the initial step onto the ladder is approximately six inches below the deck level, requiring the user to access the ladder in precisely the manner that the plaintiff did."[159]  Another post-accident report criticized the access to the ladder, the awkward entry to the ladder, and the increased risk of injury posed by same.  Notably, [e]ven among Chevron personnel, there were some who

---

[155] *Id.* at *2-3.
[156] *Id.* at *3 (citing *Reed v. Wal–Mart Stores, Inc.*, 97–1174 (La.03/04/98), 708 So.2d 362, 364).
[157] *Id.* (citing *Brooks v. State ex rel. Dept. of Transp. and Development*, 2010–1908 (La.07/01/11), 74 So.3d 187, 196).
[158] *Id.*
[159] *Id.* at *4 (footnotes omitted).

thought the design of the drop bar was a causal factor in the accident, and some who thought that it was not."[160]

The court considered photographic evidence of the lift bar and ladder and deposition testimony by several users regarding the different ways in which they would approach and use the lift bar and ladder.[161]   Ultimately, the court found that a genuine dispute existed as to whether the design of the ladder and lift bar arrangement was unreasonably dangerous as well as a genuine issue of material fact as to whether the arrangement caused or contributed to the cause of the accident.[162]

The court also noted a genuine dispute regarding the condition of the ladder:

> Chevron contends that the ladder was safe, but the plaintiff contends that the ladder was unreasonably dangerous because the first rung on which one would place his or her foot was significantly below deck level, its rungs were too small, the rungs had no non-skid coating, and the rungs were rusty, making them slippery when wet. Chevron's own report describes the root causes of the accident as including the size of the ladder's rungs, the lack of non-skid coating, and the rusty rungs that become slippery when wet. Add to this the fact that it rained a few hours before the plaintiff's accident. At a minimum, the undersigned finds, with regard to the ladder itself, that there is a genuine dispute as to whether the ladder's rungs were wet when the accident occurred and, consequently, whether the condition of the ladder was unreasonably dangerous and whether the condition of the ladder caused the accident.[163]

Next, the court addressed Chevron's argument that, even assuming there to be design defects in the ladder/lift bar system, those defects are irrelevant because the risk

---

[160] *Id.* (footnotes omitted).
[161] *Id.* ("Some people said they just let the lift bar drop behind them; others said they never just let it drop but move it down into the lowered position. Some people said they rested the bar on their shoulders rather than holding it in their left hand; others said this was not possible. Chevron's principal investigator Cliff Bernard testified that resting the lift bar on the shoulder instead of holding it would be possible for some men but not for others, depending on their height. The plaintiff and Chevron's representatives agree that the design of the lift bar and ladder arrangement is awkward, and Chevron is in the process of replacing all of its lift bars with swing gates.")(footnotes omitted).
[162] *Id.*
[163] *Id.*

of harm was open and obvious to the plaintiff at all times.[164]  The plaintiff countered that a finding that the risk was open an obvious would not be fatal to his recovery; it would mandate only apportionment of fault.  The court held, "it is not necessary to resolve that legal question since there is a genuine factual issue as to whether the risk of harm was open and obvious to Domingue at the time of his accident."[165]

In conclusion, the court denied Chevron's summary judgment motion finding that:

> [R]easonable persons could differ with regard to whether any risk presented by the ladder and lift bar was obvious to the user, despite the lack of evidence of previous accidents and the ubiquity of such ladders and lift bars across the Gulf of Mexico, especially since Domingue testified that he did not think the ladder was wet when he began to climb onto it, but realized after the incident that it was wet. This Court also finds that reasonable persons could differ as to whether the design of the lift bar and its proximity to the opening in the platform deck, the lack of non-skid material on the ladder rungs, the size of the ladder rungs, the amount of rust on the ladder rungs, and the placement of the first rung of the ladder made the ladder and/or the lift bar unreasonably dangerous.[166]

Considering the reasoning and analysis in *Domingue* and applying the aforementioned standards applicable to this case, the Court finds that the following questions of genuinely disputed material facts preclude summary judgment in this case:

- Whether there was any way for any worker, whether an EMC employee or a contractor for Weatherford, to perform work on the Lena Platform without traversing the rig skid beam such that it could be classified as a "walkway," *i.e.*, whether it was reasonably avoidable;
- Whether EMC was compliant with the federal regulations applicable to maintaining the condition of the premises;
- Whether EMC was compliant with its own Safety Manual in maintaining the condition of the premises;

---

[164] *Id.* at *5.
[165] *Id.*
[166] *Id.*

- Whether EMC and/or Plaintiff considered the rig skid beam a tripping hazard;
- Whether the risk of harm presented by the rig skid beam was unreasonable or open and obvious to all;
- Whether EMC knew or should have known of the risk of harm presented by the rig skid beam based on prior incidents.

As in *Domingue*, the facts in this case demonstrate that there is contradicting summary judgment evidence in this matter regarding all the questions of fact set forth above.  There is testimony from both Weatherford and EMC employees that the rig skid beam was a tripping hazard and that no work could be performed on the Lena Platform by anyone without walking over the rig skid beam.  There is also evidence that Plaintiff did not consider the rig skid beam a hazard, and some EMC employees testified that they did not consider it a hazard.  There is evidence that EMC knew or should have known of the hazards associated with the rig skid beam based on at least one prior incident.  The findings in EMC's investigation report, and the subsequent remedies that were taken, raise questions regarding both the design and the condition of the rig skid beam.  The disputed facts in this case are supported by competent summary judgment evidence.  The Court cannot weigh evidence or make credibility determinations on a Rule 56 motion; thus, these questions must be resolved by a jury.

### C.    Plaintiff's Motion for Partial Summary Judgment – Causation

Plaintiff has moved for partial summary judgment on the issue of medical causation.   Plaintiff submits "undisputed" facts regarding Plaintiff's injury and subsequent medical care and treatment. Plaintiff claims his treating physician and medical experts agree that the rig skid beam incident was the cause-in-fact of his

current injuries and symptoms.[167]   Plaintiff points to the testimony of EMC's retained medical expert, Dr. Neil Romero, who also opined that the rig skid beam incident is the cause-in-fact of Plaintiff's injuries and symptoms.[168]

EMC opposes this motion and points to evidence in the factual record which it claims reveals disputes as to whether a pre-existing injury also contributed to Plaintiff's current injuries and symptoms and how Plaintiff's most recent injury actually occurred.[169] Thus, EMC contends the question of medical causation should be resolved by a jury.  EMC cites a healthy collection of cases holding that questions of causation should be resolved by juries.  EMC claims that both medical experts that have opined on medical causation have offered opinions that "are expressly contingent on Plaintiff's credibility as to these questions."[170]   EMC claims that resolution of the causation issue will based on "underlying questions concern[ing] Plaintiff's credibility—specifically, whether Plaintiff's accounts as to the mechanism of his injury, whether his injury (and symptoms) predated his work on Lena Platform, and whether he experienced symptoms of that injury between 2013 and 2017, are credible."[171]   EMC offers evidence suggesting that Plaintiff has been treated for a continuing history of lumbar spine and lower extremity symptoms identical to those at issue now since an incident that occurred in 2013.[172]

Based on the record before the Court and the arguments of the Parties, the Court finds that partial summary judgment on causation is inappropriate.  In Louisiana, "legal

---

[167] *See* Rec. Doc. No. 52, p. 3-4.
[168] *See, generally* Rec. Doc. No. 50-9, Romero Depo.
[169] Rec. Doc. No. 56, p. 3.
[170] *Id.* at p. 4.
[171] *Id.*
[172] *Id.* at p. 5.

causation is a question for the jury unless reasonable minds could not differ."[173]  There is record evidence challenging Plaintiff's credibility regarding two alleged incidents causing his injuries.  Reasonable minds could differ, and it is the jury's role to judge Plaintiff's credibility and weigh the evidence as to medical causation.  Plaintiff's Motion is DENIED.

## III.    CONCLUSION

For the reasons set forth above, EMC's Motion for Summary Judgment[174] is DENIED.  Plaintiff's Motion for Partial Summary Judgment Regarding Medical Causation[175] is also DENIED.

**IT IS SO ORDERED.**

Baton Rouge, Louisiana, this 8th day of June, 2022.

_____
**SHELLY D. DICK**
**CHIEF DISTRICT JUDGE**
**MIDDLE DISTRICT OF LOUISIANA**

---

[173] *Tredick v. Ekugbere*, No. 17-103-JWD-RLB, 2018 WL 5504157 at *4 (M.D. La. Oct. 29, 2018)(citing *Parents*, 135 So. 3d at 1181 ("the appellate court erred in dismissing plaintiffs' claims with prejudice *as the question of duty/risk should be resolved by the factfinder at trial*," particularly given the existence of material issues of fact (emphasis added)); *see also Fowler*, 556 So. 2d at 4–5 ("The first element [of the duty-risk analysis] is usually a judge question, and the other four [ (which includes legal causation)] are usually jury questions unless reasonable minds could not differ." (citing D. Robertson, W. Powers, Jr. & D. Anderson, Cases and Materials on Torts 83–84 (1989)); *Chatman v. S. Univ. at New Orleans*, 2015-1179 (La. App. 4 Cir. 7/6/16); 197 So. 3d 366, 375 ("Although for years the issue of whether legal cause was a fact issue or a legal issue 'baffled scholars and courts,' in *Parents of Minor Child v. Charlet*, ... the Louisiana Supreme Court confirmed that legal cause is a mixed question of law and fact for the jury (or other fact-finder) to decide."); *Nicholson v. Calcasieu Par. Police Jury*, 96-314 (La. App. 3 Cir. 12/11/96); 685 So. 2d 507, 510–11 (noting contrary authority but finding that, under *Fowler*, "Cause-in-fact and legal cause are generally questions for the jury. The exception is when, under the uncontested facts, reasonable minds could not differ." (citing *Fowler*, 556 So. 2d at 4–5)); Maraist & Galligan, *Louisiana Tort Law* § 5.02 ("legal causation is a mixed question of law and fact that the jury decides if reasonable minds could differ.... If duty is treated as an issue of law, and legal cause is treated as a mixed question of law and fact, there is a rational allocation of the decision-making function: the judge decides duty and the jury decides legal cause.")).
[174] Rec. Doc. No. 48.
[175] Rec. Doc. No. 50.